Filed 10/3/14  P. v. Scott CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JAMURL A. SCOTT,<br><br>　　　Defendant and Appellant. | B247079<br><br>(Los Angeles County<br>Super. Ct. No. TA123666) |

　　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

　　　　　Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　　Kamala D. Harris, Attorney General, Gerald Engler, Acting Chief Assistant Attorney General, Steven E. Mercer and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jamurl A. Scott (defendant) of first degree murder and made true findings as to gang and firearm enhancements. Defendant contends his conviction should be reversed because the trial court (1) denied his motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) for discovery of portions of the arresting officers' personnel files, (2) failed to instruct the jury on second degree murder and voluntary manslaughter, and (3) erroneously instructed the jury on first degree murder. We conclude that the trial court did not abuse its discretion in denying defendant's *Pitchess* motion, and any instructional error was not prejudicial. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2012, defendant was charged by information with the murder of Louis Smith in violation of Penal Code section 187, subdivision (a).[1] The information further alleged (1) defendant personally and intentionally discharged a firearm, causing great bodily injury and death to Smith (§ 12022.53, subd. (d)); (2) defendant personally used a firearm (§ 12022.53, subd. (b)); and (3) the above offense was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)).

### A. Trial

The case was tried to a jury in January 2013. The evidence adduced at trial was as follows:

#### Maya Stewart

On January 3, 2011, Smith and his girlfriend, Maya Stewart, drove to a shopping center at 1653 E. 103rd Street in Los Angeles to eat at a Chinese Express restaurant.

---

[1]    All subsequent undesignated statutory references are to the Penal Code.

Stewart knew Smith had been a member of the Bounty Hunters, a Blood gang, but she believed he was no longer active. As Stewart and Smith walked into the restaurant, Smith said, "What's up?" to defendant, who was inside. Smith typically said, "What's up?" when he encountered people he did not know "to make sure everything was cool." Defendant answered, "What's up, Loc?" Stewart understood "Loc" to refer to a Crip gang member. Smith appeared surprised by the response and again said, "What's up?" with "a little bit more edge to it." Defendant again responded, "What's up, Loc?" Smith responded, "What's up, Dawg?" Stewart understood "Dawg" to mean a member of a Blood gang.

Defendant had a little girl with him who appeared to be three or four years old. After the exchange with Smith, defendant left the restaurant with the little girl and walked towards the parking lot. A minute or two later, defendant returned without the child and said to Smith, "Let me holler at you." Stewart turned around and saw defendant and Smith fistfighting. Stewart did not know who threw the first punch. At some point, Smith pinned defendant by his neck against the glass of a Popeye's restaurant. Smith said to defendant, "Why did you Loc me? I said, 'What's up?' to you. Why did you Loc me in front of your daughter?" Smith then added, "This is Bounty Hunters." Defendant responded, "I'm not with that," and Smith said, "You're not with that? Then let me go." Each man let go of the other, and defendant walked toward a rusted blue car and drove away. As he did so, Stewart saw defendant was bleeding from his face.

After defendant left, Stewart urged Smith to leave, but he refused. Stewart and Smith walked back into the restaurant and ordered some food. Stewart noticed that Smith had blood on his hands, and she suggested he wash it off. Stewart went into Popeye's, returned to the food courtyard with wet paper towels, and began to wash Smith's hands. At some point, Stewart looked up and saw defendant coming back. He was wearing the same clothes he had worn before, but he was now also wearing a knit hat with a brim. Stewart told Smith defendant had returned, and Smith looked up and saw him. Smith pushed Stewart away, said to defendant, "You ready to do this again?" and put his fists

3

up.  Defendant pulled up his shirt and pulled out a semiautomatic pistol.  He then cocked the gun and started shooting at Smith.  Smith ran towards the Popeye's restaurant but was not able to open the doors.  Defendant continued to walk towards Smith, shooting him in the back of the head.  After firing many shots, defendant ran away.

Stewart identified defendant at the preliminary hearing and at trial as the man who shot and killed Smith.  Nothing about the way defendant was dressed the night of the murder caused Stewart to think defendant was a member of a gang.  She understood "Loc" to be an insult.

### *Gustavo Magana*

On January 3, 2011, Gustavo Magana was working at a Subway restaurant at 1653 East 103rd Street in Los Angeles.  Magana first saw defendant about 10 minutes after his shift started at 3:00 p.m.  Defendant was with two little girls.  Sometime later, Magana saw a fight break out between defendant and Smith.  Smith pinned defendant against the double doors of the Popeye's restaurant.  Three to five minutes later, defendant walked away, got into his car in the parking lot, and drove away.

Magana followed defendant to his car because he was "amazed about how much blood he was actually losing" from his nose.  After he lost sight of defendant's car, Magana returned to work and began making sandwiches.  At some point, Magana looked up and saw defendant coming from north of the Subway store.  This was "[n]ot very long" after the fight—"[m]aybe 10, 15 minutes, at best."  Defendant was no longer wearing a jacket; Magana could not recall if defendant was wearing a hat.  A few seconds later, Magana heard five to nine gunshots.  He looked up and saw defendant shooting towards Smith.  Defendant then stopped shooting and ran away.  Magana walked out of the Subway and saw Smith on the ground, bleeding profusely.

Magana identified defendant at the preliminary hearing and at trial as the man who shot Smith.

4

### *Dr. Jeffrey Gutstadt*

Dr. Jeffrey Gutstadt is a medical examiner who performed an autopsy on Smith. Smith suffered five gunshot wounds—to the right arm, right leg, and head.

### *Detective Elliott Kane*

Detective Kane is an officer with the Los Angeles Police Department (LAPD). Following the shooting, he reviewed surveillance video provided to him by the shopping center where Smith was shot. The video showed a 1980's Chevy Caprice that matched the description of the shooter's vehicle. At one point, the Caprice sped through the parking lot and wove around other cars in order to exit quickly. At 3:51 p.m., the Caprice exited the shopping center parking lot, traveling westbound towards Compton. As it exited, a man wearing a long-sleeved green shirt and blue jeans ran towards it from the area where the shooting occurred. The man ran down the middle of the street, towards the moving vehicle. About 15 seconds later, the man appeared to run next to the vehicle and to reach his left arm out to it.

### *Officer Alma Burke*

Officer Alma Burke is a detective with the LAPD homicide unit. She testified that Smith was a Bounty Hunter Blood, and defendant was believed to be a member of the Franklin Square Crips. The Bounty Hunter Bloods and Franklin Square Crips are rival gangs. At the time of the shooting, defendant had a five-year-old stepdaughter and a six-year-old son.

### *Officer Francis Coughlin*

Officer Francis Coughlin is an LAPD officer and a gang expert. He testified that in gang culture, respect "means everything." He explained: "If you have respect, you have credibility. If a gang has respect, it means it's proven. And the way a gang gets respect is by committing certain violent crimes, such as robberies, shootings, assault with deadly weapons, murders. When an individual is respected in a gang, it means he has put

5

in work, he's committed certain crimes that has earned him a reputation in that gang." If a gang member is disrespected, "he has an obligation to retaliate . . . [b]ecause they need to maintain that credibility. . . . If a gang member is disrespected and that gang member does not retaliate, that gang's not considered credible, or it's considered weak or soft. When a gang is soft, larger gangs come over and will take over that gang or what they call swallow up the gang. It could even take over the neighborhood."

Franklin Square Crips is a relatively small gang. It is aligned with the Grape Street Crips, which is a bigger gang. Franklin Square's primary activities are graffiti, robberies, narcotics, shootings, and murder. Officer Coughlin believes defendant is a member of Franklin Square.

Franklin Square's enemies are the Bounty Hunter Bloods and the Hacienda Village Bloods. Smith was a high-ranking member of the Bounty Hunter Bloods; at some point, he was the highest ranking member of the Bounty Hunter Bloods.

The mall where Smith was killed is bordered by the territories of the Franklin Square Crips, Grape Street Crips, Bounty Hunter Bloods, Hacienda Village Bloods, and Fudgetown Crips. The mall is referred to as a neutral zone, but there have been many gang incidents there over the years.

"Loc" means "Love of Crips." In Officer Coughlin's experience, it is a nickname used between fellow Crips. It is also a way of determining if someone else is a Crip. "Dawg" is a term frequently used between gang members, but Officer Coughlin is not aware that it has a specific meaning or references a Blood gang. If a Crip says, "What's up, Loc?" to a person who is a member of a Blood gang, and that person responds, "What's up, Dawg?," he is "telling the Crip gang member that he's not a Crip, without disrespecting the Crip gang member." If the Blood member wanted to disrespect the Crip, he could say, "What's up, Blood?"

In Officer Coughlin's opinion, the facts of this case suggest a murder committed for the benefit of, at the direction of, or in association with a criminal street gang. He explained that such murder "benefitted the individual who did the shooting as well as it benefitted the entire gang. . . . [I]t benefits the shooter in the situation because, when a

6

gang member kills another gang member, it enhances his status within the gang. He earns more respect from his peers, and he's looked upon more favorably by the youngsters. He also is more trustworthy because he defended his hood. It benefits the entire gang because, in part, gangs tend to sustain themselves, as we talked about earlier, by fear and intimidation in the community. When a gang member murders another gang member openly, in public, in a shopping mall, it's a crime that shocks the consciousness. The citizens in that area that are witnesses are very fearful. And when a gang can make citizens in their areas fearful, most citizens don't want to cooperate with law enforcement, so they don't call police to report crimes. They definitely don't come to court and testify against [them,] they stay inside, they stay off the streets. When this happens, gangs operate more freely and are able to conduct their criminal behaviors without fear of interference, and that benefits the whole gang tremendously."

Officer Coughlin also opined that the murder was gang related: "[I]t seems like [defendant] hit up the Bounty Hunter, believing maybe he was a Crip. When the Bounty Hunter didn't acknowledge, he hit him up again. When the Bounty Hunter Blood responded, saying, 'What's up, Dawg?,' he was letting the Crip know, 'I'm not a Crip.' Then it starts to escalate into gang activity, where both gang members almost have to represent their gang[] [a]fter the fight[.] [W]hen the Crip, it sounds like, loses the fight, goes and gets his gun, he's — he's putting in work for his gang. He's showing the credibility of the gang. And he's following gang codes where, if you get punked, you can either go home and be considered soft or you can go back, escalate the situation, take it one step further, and show what your hood's made of. And that's what it seemed like he did here by killing him." Officer Coughlin opined that defendant was still an active member of his gang because "if he wasn't part of the gang and he was an ex-gang member, he should have known, first of all, not to what they call 'Loc' somebody. But also, once he knew the response was, 'What's up, Dawg?,' he should have left it alone." In Officer Coughlin's opinion, the murder was not committed simply because the shooter was "angry [he] lost the fight."

*B.* *Verdict, Judgment, and Appeal*

On January 17, 2013, the jury found defendant guilty of murder in the first degree, and made true findings as to the charged firearm and gang enhancements. The court sentenced defendant to a term of 80 years to life in state prison, calculated as a base term of 25 years to life pursuant to section 187, subdivision (a), plus 25 years to life pursuant to sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) through (i), plus 25 years to life pursuant to section 12022.53, subdivision (d), plus five years pursuant to section 667, subdivision (a)(1). The court also ordered defendant to pay fines and restitution.

A judgment of conviction was entered on February 13, 2013. Defendant timely appealed.

## DISCUSSION

## I. The Trial Court Did Not Abuse Its Discretion in Denying Defendant's *Pitchess* Motion

*A.* *Background*

On September 6, 2012, defendant filed a *Pitchess* motion seeking discovery of portions of the personnel records of arresting Officers Burke and Carreon "relating to accusations that the above named officers engaged in acts of excessive force, bias, dishonesty, coercive conduct or acts constituting a violation of the statutory or constitutional rights of others." (Fns. omitted.) Defense counsel's supporting declaration stated that Officers Burke and Carreon "claim in the police report (attached) that on May 15, 2011, they interviewed Jamurl Scott in Kansas City, Missouri. They state in the police report that after advising Mr. Scott of his *Miranda*[2] rights he did not deny being at the crime scene and that Mr. Scott stated that the motive for the murder was personal. [¶] Mr. Scott never told Officers Burke and Carreon that he was present at the crime scene.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

8

In fact, Mr. Scott told the officers that he could not discuss such a serious case without the presence of his attorney and that he had heard from rumors on the street about the homicide. Furthermore, Mr. Scott never told the Officers that the homicide was personal; in fact Mr. Scott had told them that he had heard that the homicide was not personal.

"The Officer's [*sic*] claims that Mr. Scott admitted to being present at the crime and that the homicide was committed for personal reasons are false. Mr. Scott never said he was present at the crime scene nor did he say the homicide was committed for personal reasons. [¶] The defense intends to prove at trial that the Officers have engaged in such behavior in the past and that they are not credible. The defense intends to show that the Officers have a habit and custom of making false allegations and lying in their police reports. The defense also intends to show that the Officers have falsified police reports to prove and improve cases against innocent defendants. As such, other victims or witnesses of misconduct in the past would prove not only that the Officers have a habit and custom of committing such misconduct but that they acted in conformity with that habit and custom in this case."

The police report attached to defendant's *Pitchess* motion states that Officers Burke and Carreon interviewed defendant in Kansas City on May 15, 2011. However, the report was prepared and signed by only Officer Burke, and only Officer Burke testified at trial.

On October 1, 2012, the trial court ordered the police department's custodian of records to produce relevant portions of Officer Burke's personnel file. The court declined to order production of Officer Carreon's personnel file, noting that "I have a police report that [defense] attached that says [the] reporting officer[] is Alma Burke, No. 32517. It has a spot for another officer and it's not filled in." After an in camera hearing, the court did not order any portions of Officer Burke's file produced, stating as follows: "[The] [r]ecord will reflect we conducted the in-camera of the *Pitchess* motion as to Officer Burke, false police reports, acts of dishonesty. Custodian of the records said there were no complaints filed within the last five years."

9

### B.     Analysis

Evidence Code sections 1043 and 1045, which codified the Supreme Court's decision in *Pitchess*, allow discovery of certain relevant information in peace officer personnel records on a showing of good cause. Discovery is a two-step process: "To initiate discovery, the defendant must file a motion supported by affidavits showing 'good cause for the discovery,' first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue. (§ 1043, subd. (b)(3).) . . . [¶] If the trial court finds good cause for the discovery, it reviews the pertinent documents in chambers and discloses only that information falling within the statutorily defined standards of relevance. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226-1227; see *City of Los Angeles v. Superior Court* [(2002)] 29 Cal.4th [1,] 9-10.) The trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.' (§ 1045, subd. (b); *City of Los Angeles*, *supra*, 29 Cal.4th at p. 9.) Typically, the trial court discloses only the names, addresses, and telephone numbers of individuals who have witnessed, or have previously filed complaints about, similar misconduct by the officer. (See *Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1089-1090.)" (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.)

"When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. [Citation.] A law enforcement officer's personnel record will commonly contain many documents that would, in the normal case, be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records. [Citation.] Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in

10

camera review. But if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court. Such practice is consistent with the premise of Evidence Code sections 1043 and 1045 that the locus of decisionmaking is to be the trial court, not the prosecution or the custodian of records. The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion. A court reporter should be present to document the custodian's statements, as well as any questions the trial court may wish to ask the custodian regarding the completeness of the record. [Citation.] [¶] The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review." (*People v. Mooc*, *supra*, 26 Cal.4th at pp. 1228-1229.)

A trial court has broad discretion in ruling on a *Pitchess* motion, and a reviewing court should reverse the trial court's determinations only on a showing that the court abused this discretion. (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086, citing *People v. Samayoa* (1997) 15 Cal.4th 795, 827; *People v. Gill* (1997) 60 Cal.App.4th 743, 749.)

In the present case, the trial court did not abuse its discretion in declining to order the custodian of records to produce any portion of the personnel file of Officer Carreon. Officer Burke, *not* Officer Carreon, prepared the police report that purports to summarize defendant's statements to the arresting officers. In the absence of any showing that Officer Carreon made or adopted the purportedly false statements contained in the police report, they cannot be attributed to him.

With regard to Officer Burke, we have reviewed the transcript of the in camera hearing, and find no error in the trial court's finding that there were no discoverable materials in her personnel file. Defendant's *Pitchess* motion thus provides no basis for reversal.

11

**II.    The Trial Court Did Not Prejudicially Err by Failing to Instruct the Jury on Second Degree Murder and Voluntary Manslaughter**

Defendant contends we must reverse his first degree murder conviction because the trial court failed to instruct the jury on second degree murder and voluntary manslaughter.  For the reasons that follow, we conclude there was no prejudice, and therefore any instructional error provides no basis for reversal.

*A.    Homicide Instructions Requested and Given*

The defense's primary theory at trial was that defendant was not the person who shot and killed Smith, and thus he should be acquitted of all charges.  Alternatively, defense counsel asked for jury instructions on voluntary manslaughter/heat of passion (CALCRIM No. 570)[3] and voluntary manslaughter/unreasonable self-defense

---

[3]    CALCRIM No. 570 (Voluntary Manslaughter:  Heat of Passion—Lesser Included Offense (Pen. Code, § 192, subd. (a))) provides:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1.  The defendant was provoked;

"2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

"AND

"3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up (his/her) own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding

12

(CALCRIM No. 571).[4] Defense counsel noted that immediately before he was shot, Smith "got in a fighting stance, and said something to the effect of, 'Are we going to do this again?' or 'Let's do this again.'" The trial court refused to give the requested voluntary manslaughter instructions, concluding they were not supported by the evidence or by defendant's theory of the case. Defense counsel did not request, and the trial court did not give, an instruction on second degree murder.

---

whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"[If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

[4]      CALCRIM No. 571 (Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another—Lesser Included Offense (§ 192)) provides in relevant part:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/[or] imperfect defense of another).

"If you conclude the defendant acted in complete (self-defense/[or] defense of another), (his/her) action was lawful and you must find (him/her) not guilty of any crime. The difference between complete (self-defense/[or] defense of another) and (imperfect self-defense/[or] imperfect defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in (imperfect self-defense/[or] imperfect defense of another) if:

"1. The defendant actually believed that (he/she/[or] someone else/_____ <insert name of third party>) was in imminent danger of being killed or suffering great bodily injury;

"AND

"2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"BUT

"3. At least one of those beliefs was unreasonable."

13

The only homicide instructions the jury received, therefore, were CALCRIM Nos. 520 (First and Second Degree Murder With Malice Aforethought) and 521 (First Degree Murder), as follows:

"The defendant is charged in count 1 with murder, in violation of Penal Code section 187.

"To prove the defendant is guilty of this crime, the People must prove that:

"No. 1, the defendant committed an act that caused the death of another person;

"and, 2, when the defendant acted, he had a state of mind called malice aforethought.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if he unlawfully intended to kill.

"The defendant acted with implied malice if:

"No. 1, he intentionally committed an act;

"2, the natural and probable consequences of the act were dangerous to human life;

"3, at the time he acted, he knew his act was dangerous to human life;

"and 4, he deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hate or ill will towards the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

"If you decide the defendant committed murder, you must then decide whether it is first or second degree. . . .[5]

---

**5** The trial court omitted the last sentence of CALCRIM No. 520, which says: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. [521]."

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing was deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and calculated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The People have the burden of proving beyond a reasonable doubt the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."[6]

### B. *Legal Principles*

#### 1. Murder

"'Homicide is the killing of a human being by another . . . .'" (*People v. Antick* (1975) 15 Cal.3d 79, 87.) Criminal homicide is divided into two types: murder and manslaughter. (*People v. Beltran* (2013) 56 Cal.4th 935, 941-942 (*Beltran*).)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice aforethought may be express or implied.

---

[6] The court omitted the last six words of CALCRIM No. 521 (*italicized*): "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder *and the murder is second degree murder*."

15

(§ 188.) "Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

"'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]"' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

"'"'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.'"' (*People v. Burney* [(2009)] 47 Cal.4th [203,] 235.) These three factors, however, are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive. [Citations.]" (*People v. Brady* (2010) 50 Cal.4th 547, 561-562.)

"'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. (§§ 187, subd. (a), 189; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.)' ([*People v.*] *Hansen* [(1994)] 9 Cal.4th [300,] 307.)" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

16

## 2. Manslaughter

Manslaughter is a lesser included offense of murder. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*).) The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills *without* malice does not commit murder. (*Beltran*, *supra*, 56 Cal.4th at p. 942.)

"Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, '"at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' (*People v. Barton* (1995) 12 Cal.4th 186, 201.) Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran*, *supra*, 56 Cal.4th at p. 942, fn. omitted.)

Heat of passion manslaughter has both objective and subjective elements. The objective element looks to the conduct of a reasonable person in like circumstances: "'"[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. Thus, no man of extremely violent passion could so justify or excuse himself if the exciting cause be not adequate, nor could an excessively cowardly man justify himself unless the circumstances were such as to arouse the fears of the ordinarily courageous man. Still further, while the conduct of the defendant is to be measured by that of the ordinarily reasonable man placed in identical circumstances, the jury is properly to be told that the exciting cause must be such as would naturally tend to arouse the passion of the ordinarily reasonable man.'" (*Beltran*, *supra*, 56 Cal.4th at p. 950.) Additionally, the defendant must "*actually* be motivated by passion in committing the killing. '[I]f

17

sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion." [Citation.]' [Citations.] Thus, it is insufficient that one is provoked and later kills. If sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored, [California law] provides no mitigation for a subsequent killing." (*Id*. at p. 951.)

### 3. The Trial Court's Duty to Instruct on Lesser Included Offenses

"'"In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* [(1998)] 19 Cal.4th [142,] 154.) This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. (*Ibid*.) The trial court must so instruct even when, as a matter of trial tactics, a defendant not only fails to request the instruction, but expressly objects to its being given. (*Ibid*.; see also *People v. Barton*[, *supra*,] 12 Cal.4th [at pp.] 196, 199-203 [trial court must instruct on heat-of-passion and unreasonable self-defense theories of manslaughter, if supported by evidence, even when defendant objects on the basis that such instructions would conflict with his defense].)' (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.)" (*People v. Moye* (2009) 47 Cal.4th 537, 548-549 (*Moye*).) "The rule that juries must be instructed on lesser included offenses '"prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.'"" (*People v. Smith* (2013) 57 Cal.4th 232, 239-240 . . . .)" (*People v. Banks* (2014) 59 Cal.4th 1113, 1159-1160.)

Because second degree murder is an offense "necessarily included within first degree murder" (*People v. Wickersham* (1982) 32 Cal.3d 307, 326, disapproved on other grounds in *People v. Barton*, *supra*, 12 Cal.4th at p. 201 (*Barton*)), and voluntary

manslaughter is a lesser included offense of murder (*Thomas*, *supra*, 53 Cal.4th at p. 813), the trial court had a duty to instruct on these theories "if there [was] substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense[s] but not the greater, charged offense" (*ibid*.). We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

### 4. Prejudice

Even if a trial court errs in failing to instruct, such failure does not automatically require reversal. Instead, in a noncapital case such as this one, "the failure to instruct . . . on a lesser included offense . . . is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165 (*Breverman*); *Beltran*, *supra*, 56 Cal.4th at p. 955.) Under that standard, a defendant's conviction may be reversed "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred ([*People v.*] *Watson* [(1956)] 46 Cal.2d 818, 836)." (*Breverman*, *supra*, at p. 178.)[7] "'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence

---

[7] Defendant contends that the trial court's failure to instruct on second degree murder violated his federal due process rights and, thus, requires reversal unless the error was harmless beyond a reasonable doubt. Not so. The case on which defendant relies for this proposition, *Beck v. Alabama* (1980) 447 U.S. 625, 632-635, was an appeal from a sentence of death. Our Supreme Court has held, however, that federal law has no effect on the appropriate standard of California appellate review in a case such as this one—a "*noncapital* case [where] defendant challenges his otherwise valid conviction of a charged offense on grounds the trial court failed in its sua sponte duty under California law to provide instructions, correct and complete, on all lesser included offenses." (*Breverman*, *supra*, 19 Cal.4th at p. 172, italics added and original italics omitted.)

supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. Accordingly, a determination that a duty arose to give instructions on a lesser included offense, and that the omission of such instructions in whole or in part was error, does not resolve the question whether the error was prejudicial. Application of the *Watson* standard of appellate review may disclose that, though error occurred, it was harmless.' (*Breverman*, *supra*, 19 Cal.4th at pp. 177-178, fn. omitted.)" (*Moye*, *supra*, 47 Cal.4th at p. 556; see also *Beltran*, *supra*, 56 Cal.4th at p. 955 ["[D]efendant argues the standard for evaluating federal constitutional errors applies here, i.e., 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' (*Chapman v. California* (1967) 386 U.S. 18, 24.) He asserts the ambiguity introduced into the instructions here deprived him of his federal constitutional rights to a jury trial and due process. We have previously rejected this argument. In noncapital cases, 'the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law.' [Citation.] As such, 'in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson*.' [Citations.]"].)

C.      *The Trial Court Did Not Prejudicially Err in Failing to Instruct the Jury on Second Degree Murder and Voluntary Manslaughter*

Defendant urges that the evidence supported the lesser included offenses of second degree murder and voluntary manslaughter, and thus that the trial court erred in failing to instruct on these theories. The Attorney General disagrees, contending that there was no substantial evidence that would have warranted an instruction on either theory.[8]

---

[8]      The Attorney General concedes that the trial court erred in telling the jury that if it decided defendant committed murder, it must determine whether it was murder in the

20

As we have said, instructional error warrants reversal only if it is reasonably probable that the defendant would have received a more favorable result had the jury been properly instructed. For the reasons that follow, we conclude that even if the jury had been instructed on second degree murder and manslaughter, it is not reasonably probable that it would have acquitted defendant or convicted him of a lesser offense. Therefore, we assume without deciding that the trial court erred in failing to instruct the jury on second degree murder and manslaughter, and move directly to the issue of prejudice.

1.      The Strength of the Evidence

Defendant contends there was substantial evidence that he did not shoot Smith with premeditation and deliberation, "but instead acted *without* premeditation and deliberation—out of anger and humiliation arising from their recent confrontation. The two men had two verbal confrontations, including one that occurred in front of Scott's little daughter. The two men also had a physical fight that left Scott the bloodied loser. Even the prosecutor argued that Smith had humiliated Scott in public. This sequence of events and evidence did not establish a plan to kill Smith. The argument and fight between Scott and Smith suggested Scott shot Smith on the spur of [the] moment and without premeditation." (Internal record reference omitted.) Thus, defendant urges, the trial court erred in failing to instruct sua sponte on second degree murder and voluntary manslaughter.

As discussed above, in evaluating prejudice an appellate court may consider, among other things, "'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. . . .' (*Breverman*, *supra*, 19 Cal.4th at pp. 177-178, fn. omitted.)"

---

first or second degree. She urges that the omission was harmless, however, because there was no evidence to support the giving of a second degree murder instruction.

21

(*Moye*, *supra*, 47 Cal.4th at p. 556.)  In the present case, the evidence of premeditation and deliberation was strong.  The undisputed evidence was that prior to the shooting, Smith bested the shooter in a fistfight.  The shooter then left the scene of the fistfight, changed some of his clothing, and obtained a semiautomatic pistol.  Ten to 15 minutes later, he returned and, without speaking to Smith, shot him multiple times at close range.  When Smith fell, the shooter ran from the scene and toward an apparent getaway vehicle, which immediately exited the shopping center parking lot.

In contrast, the evidence supporting heat of passion or provocation was comparatively weak.  Because the defense theory was one of mistaken identity, the defendant did not present any evidence placing heat of passion at issue, although he did briefly argue the issue.  The undisputed evidence was that the fight between Smith and the shooter was not particularly violent—although the shooter suffered a bloody nose, he apparently was not seriously hurt.  There was, moreover, *no* evidence about the shooter's affect or statements immediately before or after the shooting, from which the jury could conclude that the shooter's reason "'was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'"  (*Barton*, *supra*, 12 Cal.4th at p. 201.)  Given the strong evidence of premeditation and the comparatively weak evidence of lack of premeditation/provocation, a different result was not reasonably probable.

### 2.    The Jury's Findings

In considering prejudice, we consider not only the strength of the evidence presented at trial, but also the jury's evaluation of that evidence as expressed in its findings.  If such findings are inconsistent with conviction of a lesser included offense, the failure to instruct on such offense is not prejudicial.

Our Supreme Court illustrated this principle in *Moye*, *supra*, 47 Cal.4th 537.  There, the defendant was accused of bludgeoning his victim to death with a baseball bat.  At the defense's request, the trial court instructed the jury on justifiable homicide based

22

on reasonable self-defense and the imperfect (or unreasonable) self-defense theory of voluntary manslaughter; the court refused, however, to instruct the jury on a sudden quarrel/heat of passion theory of voluntary manslaughter. The jury rejected justifiable homicide and imperfect self-defense and convicted defendant of second degree murder. (*Id.* at pp. 540-541.)

The Court of Appeal reversed, holding that the failure to instruct on sudden quarrel/heat of passion was prejudicial error. The Supreme Court disagreed, concluding that substantial evidence did not support a sudden quarrel/heat of passion theory; in the alternative, it concluded that instructional error was not prejudicial. With regard to prejudice, the court explained that it was not reasonably probable *in light of its other findings* that the jury would have found the killing to have occurred in the heat of passion:

"In employing the *Watson* standard of review here, it is reasonable to assume the jury considered all of the defense evidence bearing on defendant's state of mind and the question whether he harbored malice when it entertained *and rejected* his claims of reasonable and unreasonable (or imperfect) self-defense. Ruben [victim's friend] testified that despite his and [victim's] best efforts to avoid defendant, defendant spotted them, sped toward them as if trying to run them down, then abruptly stopped the car and jumped out, along with [defendant's friends], leaving the vehicle in the middle of the street with its doors open, as they began chasing the two. Ruben testified he heard defendant say, 'Come on, let's go, let's get these motherfuckers.' [Victim] and Ruben quickly scaled a chain link fence. Ruben testified he thought he saw [victim] drop his bat at the beginning of the chase as he was going over the fence. Defendant immediately followed [victim] over the fence and chased him a considerable distance before cornering him in a field or large backyard.

"Ruben and [victim] became separated during the chase. When Ruben heard defendant and the others leaving the area he looked for [victim] and found him facedown on the ground, bleeding badly, with his breathing labored. His front upper teeth were broken off, as if he had been hit hard in the mouth, and his 'brains [were] hanging out of

23

his head.'  An autopsy revealed that [victim] sustained at least four blows to the head and three more to other areas of his body.  In one area of his head, the force of a blow was so strong it shattered his skull into multiple small fragments.  Moments after fleeing the crime scene, defendant had enough sense and composure to dispose of the bloodied murder weapon in a nearby storm drain.

"Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense.  To the contrary, the evidence established beyond a reasonable doubt that defendant located the victim and Ruben the morning after the fistfight, enlisted the assistance of [his friends], chased the victim over a chain link fence and through a field, caught him and bludgeoned him to death with a baseball bat, after which defendant disposed of the bloodied murder weapon in a nearby storm drain.  Defendant's claim—that the victim kicked his car before trying to run for safety, and that he only chased the victim to 'see where he was going' so he could report the alleged car-kicking incident to the police—was ultimately rejected by the jury when it considered such evidence and found that he had killed with malice.

"Moreover, the jury having rejected the factual basis for the claims of reasonable and unreasonable self-defense, it is not reasonably probable the jury would have found the requisite *objective* component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter.

"Upon examining the entire cause, including the evidence (Cal. Const., art. VI, § 13), we conclude it is not 'reasonably probable' defendant would have obtained a more favorable outcome at trial had a heat of passion instruction been given.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)"  (*Moye*, *supra*, 47 Cal.4th at pp. 556-558, fns. omitted.)

The court similarly concluded in *People v. Beames* (2007) 40 Cal.4th 907 (*Beames*), holding that any error with regard to omitted instructions was harmless.  The

24

court explained: "'"[E]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions."'" (*People v. Chatman* (2006) 38 Cal.4th 344, 392; [*People v.*] *Horning* [(2004)] 34 Cal.4th [871,] 906; see *People v. Sedeno* (1974) 10 Cal.3d 703, 721, disapproved on other grounds in *People v. Breverman*, *supra*, 19 Cal.4th at p. 165.) Here, the jury was properly instructed that a torture-murder special circumstance requires the intent to kill. [Fn. and citations omitted.] When the jury found this special circumstance true, it necessarily determined that defendant intended to kill [victim] when he tortured her. Thus, there was no prejudice resulting from any erroneous failure to instruct on second degree felony murder [citation] or involuntary manslaughter [citation]. Likewise, in finding the killing was intentional, the jury necessarily found express, not implied, malice. [Citation.] Accordingly, any error in failing to instruct on implied-malice second degree murder also was harmless." (*Beames*, *supra*, 40 Cal.4th at p. 928.)

Applying the principles articulated in *Moye* and *Beames* to the present case, we conclude that the failure to instruct on second degree murder and voluntary manslaughter, even if erroneous, was not prejudicial. Much of the prosecution's evidence went to proving that defendant committed the murder for the benefit of the Franklin Square Crips, of which defendant was a member. In this regard, Officer Coughlin opined that although the fight between defendant and Smith began as an individual dispute, defendant's decision to kill Smith was gang related. He said: "[B]oth gang members almost have to represent their gang[] [a]fter the fight[.] [W]hen the Crip, it sounds like, loses the fight, goes and gets his gun, he's — he's putting in work for his gang. He's showing the credibility of the gang. And he's following gang codes where, if you get punked, you can either go home and be considered soft or you can go back, escalate the situation, take it one step further, and show what your hood's made of. *And that's what it seemed like he did here by killing* [*Smith*]." (Italics added.)

On cross-examination, defense counsel asked Officer Coughlin if the shooting could have happened for non-gang-related reasons—i.e., because the shooter "may have

25

just been angry [he] lost the fight." Officer Coughlin said that in his opinion, the shooting could *not* have been unrelated to defendant's and Smith's gang affiliations.

Both the prosecution and defense returned in closing argument to the subject of motive for the shooting. The prosecutor argued that defendant shot Smith to enhance the credibility of his gang:

"[Defendant] decided he was going to live up to his real, true name of 'Blood Killer,' and he was going to do just that. He was going to go back there, and he was going to kill a Blood. And he was going to do it because he had been disrespected, just minutes away from where his gang — the area where his gang calls home. And so he was going to come back and retaliate, just like gangsters do. . . . [N]ow, not only has Mr. Scott lost a fight in a very public place, a food courtyard — you have Popeye's, Chinese Express, Subway. You have Gustavo [Magana] talking about how he had a line of customers. This place is full of people, and it's 3:30 in the afternoon. And a Franklin Square Crip, a credible gang — well, you just can't have that. You can't be humiliated in front of the public. You can't let your gang be seen as soft. So once Louis [Smith] gives him an excuse, once he gives him something he can hang his hat on, and he says, 'This is Bounty Hunters,' it's on."

The defense's closing argument was devoted almost entirely to arguing that the prosecution had not proven defendant was the shooter. The defense also briefly argued motive, urging that the suspect shot Smith not to benefit the gang, but because he was enraged by the public beating he had suffered at Smith's hands:

"Why bring in all of this gang stuff? This is not a gang incident. This is two guys who get into a fight. And, with all due respect, somebody's saying, 'Let me holler at you,' that's not trying to be a gangster. Whoever did this probably got their ass kicked and came back angry. . . . I don't believe that that is a gang shooting. That is someone getting their ass kicked and coming back because they're upset somebody got the better of them."

After deliberating, the jury rejected the defendant's view of the evidence. It found defendant was the shooter and found true the special finding that Smith's murder was

committed "for the benefit of, at the direction of and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members within the meaning of [P]enal [C]ode section 186.22[, subdivision] (b)(1)(C)."[9]

In employing the *Watson* standard of review here, it is reasonable to assume that the jury considered all of the evidence bearing on defendant's state of mind when it concluded that defendant shot Smith "*for the benefit of* . . . any criminal street gang" and "*with the specific intent* to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1), italics added.) In doing so, it necessarily rejected the defense version of the shooting, in which the shooter acted in the heat of passion after having been publicly beaten in a fistfight. Instead, the jury accepted the prosecutor's version, which posited that defendant made a calculated decision to retrieve his gun and return to the victim's location in order to retaliate for the disrespect shown his gang.

Having rejected the factual basis for the theory urged by the defense—that defendant was not the shooter and, in any event, the shooting was motivated by passion and rage, not a desire to benefit his street gang—it is not reasonably probable that the jury would have returned a second degree murder or voluntary manslaughter verdict. Indeed, it is difficult for us to conceive how a jury could conclude that the defendant left the scene of the fistfight, retrieved his gun, and then returned to the shopping center to commit an execution-style murder *for the benefit of his criminal street gang and with the specific intent to promote criminal conduct by gang members*—but without deliberation or premeditation. That is, on the particular and undisputed facts of this case, which include the shooter leaving the victim's location and then returning 10 to 15 minutes later with a semiautomatic weapon, we do not believe it likely that a jury would find that the defendant formed the specific intent to shoot and kill Smith in order to "promote, further, or assist" criminal conduct by members of his gang, but without having engaged in

---

[9]    Section 186.22, subdivision (b)(1) provides sentence enhancements for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

27

sufficient deliberation to constitute first degree murder. Accordingly, even if the trial court erred in failing to instruct on second degree murder and voluntary manslaughter, any such error was not prejudicial and, therefore, provides no basis for reversal.

## III. The Trial Court's First Degree Murder Instruction Was Not Prejudicially Erroneous

The trial court instructed the jury concerning first degree murder using CALCRIM Nos. 520 (First and Second Degree Murder With Malice Aforethought) and 521 (First Degree Murder). Defendant contends that these instructions were erroneous because they failed to tell jurors that the prosecution was required to affirmatively prove the absence of provocation to prove defendant guilty of first degree murder. Further, he contends, the alleged omission relieved the prosecution of the burden of proving each element of murder beyond a reasonable doubt, and thus constituted federal constitutional error.

We do not agree. As an initial matter, our Supreme Court has never held that where there is evidence of heat of passion, the jury must be instructed that an intentional, unlawful killing is without malice if done in a heat of passion, and thus constitutes not murder but voluntary manslaughter.[10] In any event, there was insufficient evidence of

---

[10] Justice Kennard twice has suggested in dissenting opinions that because of the manner in which California has structured the relationship between murder and voluntary manslaughter, "the complete definition of malice is the intent to kill or the intent to do a dangerous act with conscious disregard of its danger *plus the absence of* both heat of passion and unreasonable self-defense." (*Breverman*, *supra*, 19 Cal.4th at pp. 189-190 (dis. opn. of Kennard, J.).) Thus, she has said, where there is sufficient evidence of heat of passion to support a voluntary manslaughter verdict, "murder instructions that fail to inform the jury it may not find the defendant guilty of murder if heat of passion is present are incomplete instructions on the element of malice." (*Ibid*.) Further, "when a defendant is charged with murder and there is sufficient evidence to support a conviction for voluntary manslaughter on a 'heat of passion' theory, failure to instruct on that theory violates the defendant's federal constitutional rights to a jury trial and to due process of law." (*Id*. at p. 187; see also *Moye*, *supra*, 47 Cal.4th at p. 564 (dis. opn. of Kennard, J.) ["In my view, . . . the trial court's failure to instruct on the heat of passion theory of voluntary manslaughter [is] federal constitutional error"].) Justice Kennard's view has

28

heat of passion induced by adequate provocation to require such an instruction. As we have said, the undisputed evidence was that the fight between Smith and defendant was not particularly violent—although the shooter suffered a bloody nose, he apparently was not seriously hurt. The fight thus did not satisfy the objective element of provocation because it was not such as to "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" (*Beltran*, *supra*, 56 Cal.4th at p. 957; see also *Moye*, *supra*, 47 Cal.4th at p. 551 ["evidence of the fight on Saturday evening in which [victim] and defendant were both involved did not itself constitute legally sufficient provocation to require instruction on sudden quarrel/heat of passion voluntary manslaughter in connection with the killing of [victim]"].) Neither was there substantial evidence of the subjective element of provocation because the evidence presented did not establish that defendant "'actually, subjectively, kill[ed] under the heat of passion.'" (*Moye*, *supra*, at p. 554.) There was *no* evidence about the shooter's affect or statements immediately before or after the shooting, from which the jury could conclude that the shooter's reason "was obscured or disturbed by passion." (*Barton*, *supra*, 12 Cal.4th 201.) A provocation instruction therefore was not required. (See *Moye*, *supra*, 47 Cal.4th at p. 554 [no error in failing to give provocation instruction: "There was insubstantial evidence at the close of the evidentiary phase to establish that defendant 'actually, subjectively, kill[ed] under the heat of passion.' [Citations.] . . . [N]o principle of law required the trial judge below to disregard the evidence in order to find that the jury should consider whether defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter, and the evidence actually introduced on the point—the defendant's own testimony—was to the contrary."].)

Finally, even if it was error for the trial court to fail to instruct on heat of passion, such error was harmless, as discussed in part II(C), *ante*.

---

never been adopted by a majority of the Supreme Court, however, and thus we do not apply it in this case. (See, e.g., *Breverman*, *supra*, 19 Cal.4th at p. 170, fn. 19.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                COLLINS, J.

We concur:



EPSTEIN, P. J.



WILLHITE, J.

30